**UNITED STATES DISTRICT COURT**
**DISTRICT COURT OF MINNESOTA**

| | |
|---|---|
| STEVE SILVERMAN, Derivatively on Behalf of UNITEDHEALTH GROUP INCORPORATED,<br><br><br><br>Plaintiff,<br><br>v.<br><br>STEPHEN J. HEMSLEY, MICHELE J. HOOPER, TIMOTHY P. FLYNN, VALERIE C. MONTGOMERY RICE, F. WILLIAM McNABB III, JOHN H. NOSEWORTHY, PAUL R. GARCIA, KRISTEN L. GIL, CHARLES D. BAKER, RICHARD T. BURKE, ANDREW P. WITTY, WILLIAM C. BALLARD, JR., GLENN M. RENWICK, and DAVID S. WICHMANN,<br><br>Defendants,<br><br>and<br><br>UNITEDHEALTH GROUP INCORPORATED,<br><br>Nominal Defendant. | Case No.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Steve Silverman ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, UnitedHealth Group Incorporated ("UnitedHealth" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, insider trading (*Brophy* claim), unjust enrichment, and violations of Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's allegations are based upon his personal knowledge

1

as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by UnitedHealth with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.  NATURE AND SUMMARY OF THE ACTION

1.    This derivative action is brought on behalf of nominal defendant UnitedHealth against current and former officers and directors (the "Individual Defendants") who participated in or permitted a long-running scheme to inflate the Company's Medicare Advantage reimbursements.

2.    UnitedHealth operates two main segments—Optum and UnitedHealthcare—and leveraged its integrated model to systematically inflate patient risk scores submitted to Centers for Medicare & Medicaid Services ("CMS"), resulting in higher government payments.

3.    This conduct, central to its earnings and market value, involved programs like HouseCalls, which routinely generated unsupported diagnoses.

4.    Despite government scrutiny since 2016—including a DOJ-intervened False Claims Act case—the Board failed to curb these practices or implement appropriate controls.

5.    When CMS later reined in these practices, UnitedHealth sharply reduced its guidance, demonstrating that the Company had relied on false claims. Its stock price plummeted, erasing over $280 billion in value.

6.    Meanwhile, insiders including defendant CEO Andrew Witty sold more than $480 million in stock, and the Company repurchased $41 billion in shares at inflated prices, harming the Company.

7.     This action seeks to hold the Individual Defendants accountable for violating fiduciary duties, issuing false proxy statements, and unjustly enriching themselves at the Company's expense.

8.     At least half of the Company's current Board could not disinterestedly and independently respond to a litigation demand in connection with the misleading representations because, among other things …. As a result, a majority of the Board could not disinterestedly investigate whether their conduct constituted breaches of fiduciary duties under Delaware law.

## II.    JURISDICTION AND VENUE

9.     This Court additionally has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: contribution for violations of Section 10(b) of the Exchange Act. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.    PARTIES

**Plaintiff**

11.     Plaintiff Stephen Silverman has continuously owned shares of UnitedHealth stock since 2003.

**Nominal Defendant**

12.     Nominal Defendant UnitedHealth is a Delaware corporation with its principal executive offices located at 1 Health Drive, Eden Prairie, Minnesota 55344.  The Company's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "UNH."

**Defendants**

13.     Defendant Stephen J. Hemsley ("Helmsley") has served as UnitedHealth's Chief Executive Officer since May 2025, Chair of the Board since November 2019, and a member of the Board since 2000. His prior leadership roles at the Company include Executive Chair (2017–2019), CEO (2006–2017), President (1999–2014), Chief Operating Officer (1998–2006), and Senior Executive Vice President (1997–1998).

14.     Defendant Michele J. Hooper ("Hooper") has been a director at UnitedHealth since October 2007 and has served as Lead Independent Director since October 2021. She held roles on the Audit and Finance Committee during the period from at least April 2019 to April 2023.

15.     Defendant Timothy P. Flynn ("Flynn") has been a member of UnitedHealth's Board since January 2017.

16.     Defendant Valerie C. Montgomery Rice ("Rice") joined the UnitedHealth Board in August 2017.

17.     Defendant F. William McNabb III ("McNabb") has been a director of UnitedHealth since February 2018. He has chaired the Audit and Finance Committee since at least April 2022 and has been a committee member since at least April 2019.

18.     Defendant John H. Noseworthy ("Noseworthy") has served as a director of UnitedHealth since February 2019.

19.     Defendant Paul R. Garcia ("Garcia") has been on the UnitedHealth Board since November 2021 and has served on the Audit and Finance Committee since at least April 2022.

20. Defendant Kristen L. Gil ("Gil") became a director of UnitedHealth in December 2022 and has held a seat on the Audit and Finance Committee since at least April 2023.

21. Defendant Charles D. Baker ("Baker") joined the UnitedHealth Board in November 2023 and began serving on the Audit and Finance Committee by at least April 2024.

22. Defendant Richard T. Burke ("Burke") previously served as Lead Independent Director (2017–2022), Chair of the Board (2006–2017), and director (1977–2022). He was CEO of UnitedHealthcare, Inc. from 1977 to 1988.

23. Defendant Andrew Witty ("Witty") was a UnitedHealth Board member from 2017 to 2018 and again from 2021 to 2025. He served as CEO from 2021 to 2025, President from 2019 to 2021, and CEO of Optum from 2018 to 2021.

24. Defendant William C. Ballard, Jr. ("Ballard") held a Board position at UnitedHealth from 1993 until June 2020.

25. Defendant Glenn M. Renwick ("Renwick") served as a director of UnitedHealth from 2008 to 2021. He chaired the Audit and Finance Committee and was a member from at least 2019 to 2021.

26. Defendant David S. Wichmann ("Wichmann") held numerous leadership positions at UnitedHealth, including CEO (2017–2021), President (2014–2017), CFO (2011–2016), and President of several Company divisions dating back to 2002. He was a director from 2017 until 2021.

27. Defendants Helmsley, Hooper, Flynn, Rice, McNabb, Noseworthy, Garcia, Gil, Baker, Burke, Witty, Ballard, Renwick, and Wichmann are collectively referred to as the "Individual Defendants."

## IV.   DUTIES OF THE INDIVIDUAL DEFENDANTS

28.    By reason of their positions as officers, directors, and/or fiduciaries of UnitedHealth and because of their ability to control the business and corporate affairs of UnitedHealth, at all relevant times, the Individual Defendants owed UnitedHealth and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage UnitedHealth in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of UnitedHealth and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.   Each director and officer of the Company owes to UnitedHealth and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

29.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of UnitedHealth, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.   Because of their advisory, executive, managerial, and directorial positions with UnitedHealth, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

30.    To discharge their duties, the officers and directors of UnitedHealth were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of UnitedHealth were required to, among other things:

(a)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)    Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and

state laws, rules, regulations and requirements, and all contractual
obligations, including acting only within the scope of its legal authority;

(c)  Exercise good faith to ensure that the Company's communications with
the public and with shareholders are made with due candor in a timely and
complete fashion; and

(d)  When put on notice of problems with the Company's business practices
and operations, exercise good faith in taking appropriate action to correct
the misconduct and prevent its recurrence.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

31.    UnitedHealth operates primarily through two core business segments: Optum,

which provides services like data analytics, pharmacy benefits management, and direct care

delivery, and UnitedHealthcare, which offers insurance plans across employer-sponsored,

Medicare, and Medicaid markets. Among its subdivisions, the Medicare & Retirement unit is

particularly significant, contributing a substantial portion of the Company's total revenue. By

2024, this division was responsible for nearly half of UnitedHealthcare's income and

consistently generated more than one-third of the Company's overall consolidated revenue.

32.    Through the Medicare Advantage ("MA") program, private insurers like

UnitedHealth are compensated by CMS on a per-member basis, with payments adjusted to

reflect each enrollee's health risk score. These scores are derived from diagnosis codes submitted

by insurers. As patients' risk scores increase, so do the reimbursements to the insurer.

UnitedHealth capitalized on this model to secure elevated payments by inflating risk scores

through questionable diagnostic practices.

33.    With its insurance operations housed under UnitedHealthcare and its healthcare

service delivery channeled through Optum Health, UnitedHealth possessed a vertically

integrated structure that allowed it to both control care delivery and influence how diagnoses

were recorded. This arrangement created opportunities to manipulate coding practices and maximize Medicare reimbursements.

**B.     Defendants' Implementation and Concealment of the MA Billing Scheme**

34.     UnitedHealth used a variety of methods to elevate patient risk scores beyond what was clinically warranted. These included: (i) applying pressure on healthcare providers to document additional diagnoses, (ii) employing diagnostic suggestion software that flagged unsubstantiated conditions, (iii) using offshore coders in a multi-step process to finalize inflated claims, and (iv) mandating use of a questionable medical device known for generating false positives.

35.     One key tactic was the HouseCalls program, which dispatched nurse practitioners to perform in-home assessments for MA members. UnitedHealth incentivized patients to participate by offering gift cards and other perks. For example, as reported in a July 8, 2024 article by *The Wall Street Journal* ("WSJ"), an MA member received a $50 gift card for completing an in-home visit. These visits often served more as opportunities for risk score inflation than for delivering meaningful care.

36.     UnitedHealth trained healthcare professionals to generate more diagnoses during these visits. According to a December 29, 2024 *WSJ* article, a physician employed by the Company described a culture of coercion: "You're just encouraged to, because obviously, if you don't, they come bothering you." Similarly, STAT News quoted former physicians confirming that management encouraged them to highlight higher-risk conditions to increase reimbursements, sometimes negotiating with corporate leaders over how aggressive the diagnostic targets should be.

37.     Despite being framed as clinical encounters, HouseCalls visits were narrowly limited. Nurses were not authorized to prescribe medications, initiate specialist referrals, or

provide treatment, raising concerns that the primary objective was to generate documentation for billing purposes.

38.     The July 8, 2024 *WSJ* article described a nurse diagnosing a patient with diabetes-induced cataracts during one such visit. Subsequent blood tests and a review by the patient's primary physician revealed that the patient had never had diabetes. The doctor, disturbed by the Company's practices, remarked that the diagnostic inflation was egregious.

39.     In a March 18, 2024 article by *The Examiner News*, a whistleblower described how executives instructed nurses to use "buddy codes"—additional diagnostic entries that served no clinical purpose but increased risk scores. A physician in a management role reportedly admitted that these codes were partly fabricated, stating, "No one else will know what you're talking about outside of this room."  The *Examiner* article explained UnitedHealth's "three-step process" for submitting inflated claims: (1) reviewing charts to find conditions that could be recoded as active issues, (2) finalizing visit notes to shield providers from liability, and (3) employing offshore coders to add unverified diagnoses before submission.

40.     A *WSJ* investigation published on February 21, 2025 revealed that UnitedHealth used software to suggest diagnoses, rewarding clinicians who followed these suggestions. This approach incentivized the creation of inflated risk scores and further increased CMS payments.

41.     An August 4, 2024 WSJ article titled "The One-Hour Nurse Visits That Let Insurers Collect $15 Billion From Medicare" detailed how UnitedHealth's software frequently suggested obscure, high-reimbursement conditions. A former nurse recalled being prompted to diagnose hyperaldosteronism, a rare condition seldom found in MA patients. Between 2019 and 2021, this diagnosis was logged 246,000 times through in-home assessments, producing $450 million in added payments.

42.    The Company also mandated the use of QuantaFlo, a device used to identify peripheral artery disease ("PAD"). Although the FDA noted it was not intended as a standalone diagnostic tool, UnitedHealth's training materials told nurses to rely exclusively on it. Between 2019 and 2021, this device led to 568,000 PAD diagnoses, generating approximately $1.4 billion in revenue—$640 million more than all other MA insurers combined.

43.    Healthcare professionals raised concerns about QuantaFlo's accuracy. According to an article published by *STAT News* on April 16, 2025, the device's manufacturer, Semler Scientific, offered $30 million to settle DOJ claims tied to fraudulent use of the test. Despite the concerns, UnitedHealth required its continued use, even for asymptomatic patients.

44.    These practices contributed significantly to UnitedHealth's bottom line. The *WSJ* reported that each HouseCalls visit, on average, yielded $1,818 in extra revenue. The Company's average payment for each member following such visits was $2,735—far exceeding the next largest MA provider, which reported $1,525 per member.

45.    These improper billing strategies persisted despite UnitedHealth's awareness of legal risks. Since 2016, the Company has been a defendant in a whistleblower suit under the False Claims Act ("FCA"), exposing its upcoding practices to federal scrutiny. The DOJ's intervention signaled the seriousness of the allegations and the potential exposure.

46.    UnitedHealth's regulatory filings, beginning with its 2017 Form 10-K, repeatedly disclosed the existence of the FCA suit. That filing, signed by Individual Defendants Hemsley, Hooper, Flynn, Rice, Burke, Witty, Ballard, Renwick, and Wichmann, stated that the DOJ had decided to pursue certain claims filed by a whistleblower in 2011 related to improper coding practices that inflated risk scores and triggered excessive government reimbursements.  The DOJ's announcement, made on February 14, 2017, concerned improper risk adjustment

submissions in violation of the FCA. The DOJ also intervened in a separate whistleblower action filed in 2009, further highlighting the breadth of UnitedHealth's risk adjustment irregularities.

47.     UnitedHealth continued to reference the FCA litigation in its annual filings in subsequent years, making it a consistent point of disclosure and an unmistakable red flag to its Board, the members of which signed each Form 10-K referencing the FCA litigation.

48.     Moreover, the Company repeatedly disclosed in its Forms 10-K signed by the Board that the Company's "business activities are highly regulated," the Company's "businesses are subject to comprehensive federal, state and international laws and regulations," and "we fail to comply with, or fail to respond quickly and appropriately to changes in, applicable laws, regulations and rules, our business, results of operations, financial position and cash flows could be materially and adversely affected."  As a result, the Individual Defendants were all well aware of the mission critical risks presented to the Company's business by legal and regulatory compliance.

49.     The ongoing FCA litigation should have prompted the Board to curb the Company's upcoding practices. However, the Individual Defendants allowed these behaviors to persist well after they came under public and legal scrutiny.

50.     UnitedHealth's billing misconduct also drew attention from federal oversight agencies. In September 2021, the Office of Inspector General ("OIG") issued a report identifying that 20 MA insurers were responsible for roughly half of a $9.2 billion pool of potentially erroneous CMS payments. One insurer—later identified by analysts and news outlets as UnitedHealth—was found to have received about 40% of these payments despite covering only 22% of MA enrollees.

51.    In response, the OIG recommended that CMS strengthen oversight of insurers receiving disproportionately large risk-adjusted payments, clearly targeting UnitedHealth's billing patterns.

52.    On October 10, 2023, UnitedHealth was formally notified by the DOJ that it was under investigation. Although this investigation remained nonpublic at the time, it was revealed publicly by the February 27, 2024, *WSJ* article titled "U.S. Opens UnitedHealth Antitrust Probe," which confirmed that the DOJ would also examine the Company's Medicare billing practices.

53.    A subsequent report from the OIG in October 2024 further confirmed UnitedHealth's continued use of questionable billing tactics. The report, titled "Medicare Advantage: Questionable Use of Health Risk Assessments Continues to Drive Up Payments," found that 20 MA insurers received $6 billion of the $7.5 billion in risk-adjusted payments in 2023 based on Health Risk Assessments HRAs and chart reviews. UnitedHealth alone accounted for over $3.7 billion of that amount.

54.    On February 25, 2025, the *WSJ* reported that U.S. Senator Chuck Grassley had opened an inquiry into UnitedHealth's billing practices, demanding records related to its internal compliance and oversight mechanisms.

55.    Shortly thereafter, on May 14, 2025, the *WSJ* revealed that the DOJ was preparing to initiate a criminal investigation into UnitedHealth's conduct in its MA segment, specifically focusing on fraudulent billing schemes.

56.    Despite repeated warnings, UnitedHealth's reliance on inflated coding practices continued through at least 2023 and apparently into 2024. These tactics yielded billions of dollars in excessive reimbursements, a sum so large that it vastly inflated the Company's financial results and stock price.

57.     The pervasiveness of the HouseCalls program and the way it was managed strongly suggest that the Individual Defendants were fully aware of the Company's scheme. Medicare billing formed a critical component of UnitedHealth's business model, and healthcare workers were systematically pressured to generate exaggerated diagnoses.

58.     UnitedHealth's annual reports regularly tracked the volume of HouseCalls visits, indicating management's close attention to the program. In its 2020 Form 10-K, filed on March 1, 2021 and signed by Individual Defendants Hemsley, Hooper, Flynn, Rice, McNabb, Noseworthy, Renwick, Burke, and Witty, the Company disclosed that nearly 1.7 million HouseCalls visits were performed in 2020. The number rose steadily each year: 2.1 million in 2021, 2.3 million in 2022, 2.7 million in 2023, and 2.9 million in 2024—despite mounting scrutiny.

59.     As regulatory investigations intensified, UnitedHealth's financial performance suffered. On April 17, 2025, the Company issued a press release announcing a 12% reduction in its earnings forecast for 2025, citing changes in billing practices driven by regulatory reforms.

60.     During a same-day earnings call, defendant Witty confirmed that the adjustment stemmed largely from deteriorating performance in the Company's Medicare Advantage business. Rising medical costs, fueled by increased patient visits, coincided with the erosion of profits previously maintained through inflated risk adjustments.

61.     UnitedHealth's stock plummeted 27.3% over two days, from $585.04 per share on April 16, 2025, to $425.33 on April 18, 2025, wiping out $144.8 billion in shareholder value.

62.     On May 13, 2025, UnitedHealth announced the sudden resignation of defendant Witty and the suspension of its 2025 earnings guidance. The same day, defendant Hemsley was named as Witty's replacement.

63.    The market reacted harshly: UnitedHealth shares declined nearly 18% on May 13, 2025, falling $67.37 to close at $311.38 per share and eliminating another $61.1 billion in market value.

64.    A *WSJ* article published on May 14, 2025 disclosed that the DOJ was now conducting a criminal investigation into UnitedHealth's practices in the MA segment, particularly its manipulation of diagnostic data to boost reimbursements.

65.    In response to the *WSJ* article, the Company issued an unqualified denial that notably was not accompanied by any cautionary language or a forward-looking statements disclaimer:

> We have not been notified by the Department of Justice of the supposed criminal investigation reported, without official attribution, in the *Wall Street Journal* today.
>
> The WSJ's reporting is deeply irresponsible, as even it admits that the "exact nature of the potential criminal allegations is unclear."
>
> We stand by the integrity of our Medicare Advantage program.

66.    Following this revelation, UnitedHealth shares declined an additional 11% on May 15, 2025, closing at $274.35 per share—down $33.76 from the previous day—and shedding another $30.6 billion in value.

67.    In just over a month, UnitedHealth's market capitalization fell by more than $281.8 billion, with shares losing 53.1% of their value.

**C.    Insider Sales**

68.    Rather than correcting the market's understanding of the Company's financial health, several insiders chose to capitalize on UnitedHealth's inflated stock price while possessing material, nonpublic information.

14

69.     As high-level executives and directors, these individuals had access to confidential knowledge about UnitedHealth's operational risks, including its improper Medicare Advantage billing practices and the likelihood of government intervention.

70.     While in possession of this nonpublic information, Defendant Hemsley sold approximately 854,124 shares of his personally owned UnitedHealth stock, reaping proceeds of more than $351.5 million. Notably, just days after the Company received notice of the DOJ's investigation in October 2023, Hemsley sold 121,515 shares for more than $65.6 million. He followed this with another sale of 66,081 shares in December 2023, generating an additional $36 million.

71.     Similarly, Defendant Burke disposed of 340,000 shares of UnitedHealth stock, earning proceeds exceeding $110.2 million. His transactions occurred while the Company's shares remained artificially inflated due to undisclosed billing fraud.

72.     Defendant Witty sold 27,536 shares during the relevant period, receiving over $13.5 million in return. His trades coincided with critical moments in the Company's timeline when internal issues had not yet been disclosed to the market.

73.     Defendant Ballard also sold 22,000 shares for over $5.5 million while in possession of material inside information.

74.     Collectively, these four insiders—Defendants Hemsley, Burke, Witty, and Ballard—unloaded over 1.2 million shares and generated nearly $481 million in proceeds from these transactions.

75.     The table below outlines the timing, volume, and proceeds of their insider stock sales:

| Insider Name | Transaction Date | Shares Sold | Price per Share | Total Proceeds |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| HEMSLEY | 5/11/2020 | 45,637 | $289.11 | $13,194,021.80 |
| | 7/17/2020 | 170,000 | $307.74 | $52,315,800.00 |
| | 10/23/2020 | 75,000 | $329.35 | $24,700,950.00 |
| | 10/23/2020 | 23,579 | $329.86 | $7,777,863.26 |
| | 7/16/2021 | 60,000 | $420.62 | $25,237,110.00 |
| | 8/23/2021 | 70,000 | $426.30 | $29,841,154.00 |
| | 10/25/2021 | 30,014 | $44.04 | $1,321,906.60 |
| | 10/25/2021 | 29,471 | $448.97 | $13,231,447.52 |
| | 10/25/2021 | 13,515 | $449.76 | $6,078,533.43 |
| | 10/25/2021 | 50,000 | $455.57 | $22,778,700.00 |
| | 7/26/2022 | 99,312 | $534.27 | $53,059,223.62 |
| | 10/17/2023 | 121,515 | $540.58 | $65,688,590.85 |
| | 12/5/2023 | 66,081 | $550.39 | $36,370,196.04 |
| | Total | 854,124 | | $351,595,497.10 |
| WITTY | 7/21/2021 | 6,000 | $414.15 | $2,484,900.00 |
| | 7/18/2022 | 11,376 | $527.90 | $6,005,390.40 |
| | 4/27/2023 | 6,160 | $487.49 | $3,002,949.49 |
| | 7/19/2023 | 4,000 | $506.19 | $2,024,760.00 |
| | Total | 27,536 | | $13,517,999.89 |
| BALLARD | 1/22/2019 | 5,000 | $266.61 | $1,333,035.00 |
| | 5/6/2019 | 5,000 | $239.02 | $1,195,120.00 |
| | 7/23/2019 | 12,000 | $255.31 | $3,063,660.00 |
| | Total | 22,000 | | $5,591,815.00 |
| BURKE | 1/17/2019 | 15,000 | $260.55 | $3,908,259.00 |
| | 1/23/2019 | 11,500 | $268.00 | $3,082,000.00 |
| | 3/12/2019 | 5,000 | $245.01 | $1,225,055.00 |
| | 3/19/2019 | 5,000 | $257.32 | $1,286,583.50 |
| | 4/24/2019 | 10,000 | $229.75 | $2,297,501.00 |
| | 5/29/2019 | 10,000 | $241.99 | $2,419,883.00 |
| | 6/11/2019 | 10,000 | $248.00 | $2,480,000.00 |
| | 8/8/2019 | 5,000 | $246.40 | $1,232,000.00 |
| | 8/23/2019 | 2,000 | $231.50 | $463,000.00 |
| | 9/17/2019 | 2,500 | $232.76 | $581,897.00 |
| | 9/18/2019 | 2,500 | $232.60 | $581,500.00 |
| | 9/19/2019 | 2,500 | $233.40 | $583,500.00 |
| | 9/20/2019 | 2,500 | $234.20 | $585,500.00 |
| | 10/16/2019 | 25,000 | $236.56 | $5,914,015.00 |
| | 1/16/2020 | 15,000 | $299.45 | $4,491,750.00 |
| | 2/19/2020 | 10,000 | $306.04 | $3,060,385.00 |
| | 3/16/2020 | 5,000 | $237.00 | $1,185,000.00 |
| | 3/17/2020 | 10,000 | $240.10 | $2,401,037.00 |
| | 3/18/2020 | 5,000 | $212.00 | $1,060,000.00 |
| | 3/19/2020 | 5,000 | $224.40 | $1,122,000.00 |
| | 3/20/2020 | 10,000 | $228.39 | $2,283,921.00 |

| | 7/22/2020 | 10,000 | $303.50 | $3,035,017.00 |
|---|---|---|---|---|
| | 8/13/2020 | 15,000 | $320.59 | $4,808,820.00 |
| | 11/6/2020 | 700 | $349.31 | $244,516.02 |
| | 11/6/2020 | 4,300 | $350.35 | $1,506,520.05 |
| | 11/6/2020 | 5,000 | $349.41 | $1,747,064.00 |
| | 12/8/2020 | 7,000 | $349.78 | $2,448,443.90 |
| | 12/10/2020 | 2,500 | $342.00 | $855,000.00 |
| | 12/11/2020 | 3,000 | $336.50 | $1,009,500.00 |
| | 12/15/2020 | 2,500 | $340.00 | $850,000.00 |
| | 2/11/2021 | 5,000 | $335.80 | $1,678,992.00 |
| | 2/18/2021 | 2,500 | $326.99 | $817,463.75 |
| | 2/18/2021 | 1,250 | $327.36 | $409,194.50 |
| | 2/18/2021 | 1,250 | $329.07 | $411,336.88 |
| | 3/15/2021 | 4,000 | $353.33 | $1,413,300.00 |
| | 3/16/2021 | 6,000 | $354.90 | $2,129,418.60 |
| | 4/19/2021 | 2,500 | $391.25 | $978,125.00 |
| | 4/20/2021 | 2,500 | $391.25 | $978,125.00 |
| | 4/20/2021 | 10,000 | $395.43 | $3,954,250.00 |
| | 6/10/2021 | 2,000 | $402.00 | $804,000.00 |
| | 6/15/2021 | 4,000 | $400.25 | $1,601,000.00 |
| | 6/21/2021 | 4,000 | $398.63 | $1,594,500.00 |
| | 7/20/2021 | 8,000 | $414.31 | $3,314,440.00 |
| | 7/22/2021 | 7,000 | $415.70 | $2,909,867.10 |
| | 9/14/2021 | 2,500 | $416.75 | $1,041,875.00 |
| | 9/15/2021 | 10,000 | $418.06 | $4,180,625.00 |
| | 9/17/2021 | 2,500 | $419.00 | $1,047,500.00 |
| | 11/23/2021 | 2,500 | $444.70 | $1,111,750.00 |
| | 11/24/2021 | 2,500 | $450.00 | $1,125,000.00 |
| | 1/20/2022 | 5,000 | $469.41 | $2,347,044.00 |
| | 1/21/2022 | 4,000 | $468.50 | $1,874,000.00 |
| | 2/16/2022 | 5,000 | $476.72 | $2,383,587.50 |
| | 2/23/2022 | 4,000 | $465.30 | $1,861,182.40 |
| | 2/25/2022 | 6,000 | $470.38 | $2,822,305.20 |
| | 3/22/2022 | 4,000 | $511.14 | $2,044,567.60 |
| | 3/23/2022 | 3,000 | $505.67 | $1,517,001.00 |
| | 3/24/2022 | 3,000 | $508.80 | $1,526,400.00 |
| | 5/16/2022 | 2,500 | $493.25 | $1,233,125.00 |
| | 5/17/2022 | 2,500 | $493.50 | $1,233,750.00 |
| | 5/19/2022 | 2,500 | $478.96 | $1,197,410.50 |
| | Total | 340,000 | | $110,290,803.50 |

These trades demonstrate a clear pattern of insiders leveraging nonpublic knowledge for personal financial gain, while the investing public remained unaware of the Company's inflated financials and impending regulatory fallout.

**D.    Stock Repurchases**

76.    While possessing material knowledge of UnitedHealth's systemic billing abuses and the associated regulatory risks, the Board authorized numerous repurchases of the Company's common stock at prices significantly above its fair market value.

77.    These buybacks took place before the public disclosures of the Company's Medicare Advantage upcoding scheme. As a result, UnitedHealth purchased its own shares at artificially inflated prices, misallocating billions of dollars in corporate assets.

78.    Between March 31, 2019, and March 31, 2025, UnitedHealth repurchased approximately 101.8 million shares of common stock, expending a total of $41.4 billion. The chart below summarizes the volume and estimated cost of these transactions:

79.    Following the full revelation of the Company's fraudulent conduct, UnitedHealth's share price dropped dramatically. On May 15, 2025, the Company's stock closed at just $274.35 per share—a significant decline from the average repurchase price of $406.71 per share across the buyback period.

80.    Based on this corrected market valuation, the true value of the repurchased shares was only approximately $27.93 billion. Consequently, the Company overpaid by more than $14.1 billion—an extraordinary corporate waste attributable to the Individual Defendants' misconduct and breach of fiduciary duties.

81.    These repurchases served to falsely signal confidence in UnitedHealth's valuation, misled investors, and facilitated additional insider stock sales at inflated prices. The

Board's actions in approving these transactions directly harmed UnitedHealth and unjustly enriched those with insider knowledge.

## VI.    DAMAGES TO THE COMPANY

82.    As a direct and proximate result of the Individual Defendants' conduct, UnitedHealth has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a)    The cost of repurchasing the Company's own stock at artificially inflated prices;

b)    Costs related to the DOJ criminal investigation and any other regulatory or internal investigation(s);

c)    The ill-gotten gains obtained by defendants due to their insider sales based on misappropriated Company information; and

d)    Costs incurred from compensation and benefits paid to the defendants who have breached their duties to UnitedHealth.

83.    In addition, UnitedHealth's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

84.    The actions complained of herein have irreparably damaged UnitedHealth's corporate image and goodwill.  For at least the foreseeable future, UnitedHealth will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that UnitedHealth's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

85.    Plaintiff brings this action derivatively in the right and for the benefit of UnitedHealth to redress injuries suffered, and to be suffered, by UnitedHealth as a direct result of breaches of fiduciary duty by the Individual Defendants, insider trading, and violations of Section 10(b) of the Exchange Act.  UnitedHealth is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

86.    Plaintiff will adequately and fairly represent the interests of UnitedHealth in enforcing and prosecuting its rights.

87.    Plaintiff has continuously been a shareholder of UnitedHealth at times relevant to the wrongdoing complained of and is a current UnitedHealth shareholder.

88.    When this action was filed, UnitedHealth's Board of Directors consisted of nine members, Individual Defendants Hemsley, Hooper, Flynn, Rice, McNabb, Noseworthy, Garcia, Gil, and Baker.  Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

### A.    Hemsley is Not Disinterested and Independent

89.    Hemsley is the Company's CEO and therefore is not independent under NYSE listing rules. As an employee, Hemsley derives substantially all of his income from his employment with UnitedHealth, thus he could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or his fellow members of management with whom he worked on a day-to-day basis. As a result, demand is futile to him.

### B.    Demand is Excused Because There is Reason to Doubt a Majority of the Board Acted in Good Faith

90.     As described herein, Defendants Hemsley, Hooper, Flynn, Rice, McNabb, Noseworthy, Garcia, Gil, and Baker breached their fiduciary duties of loyalty and oversight by permitting the Company to engage in widespread upcoding and deceptive billing in connection with its Medicare Advantage business.

91.     These directors were aware of the Company's misconduct by virtue of multiple public disclosures and regulatory filings, including the longstanding False Claims Act litigation initiated in 2016. The case directly challenged UnitedHealth's billing practices, and its existence was disclosed repeatedly in the Company's annual reports, which were reviewed and signed by these directors.

92.     Despite mounting scrutiny from federal regulators, press investigations, and whistleblower complaints, these Board members failed to intervene or implement corrective measures, enabling the Company's fraudulent billing practices to continue for years.

93.     The same directors also approved over $41.4 billion in share repurchases during the period when the stock price was artificially inflated due to undisclosed misconduct. By doing so, they caused UnitedHealth to overpay by an estimated $14.1 billion, inflicting significant financial harm on the Company.  Specifically, the Company's 2019 Form 10-K stated that "[u]nder its Board of Directors' authorization, the Company maintains a share repurchase program… In June 2018, the Board renewed the Company's share repurchase program with an authorization to repurchase up to 100 million shares of its common stock."  A majority of the current Board, Hemsley, Hooper, Flynn, Rice, and McNabb were directors when the Board approved the 100 million share repurchase in June 2018.  Similarly, the Company's 2024 Form 10-K stated that, "[i]n June 2024, our Board of Directors amended our share repurchase program to authorize the repurchase of up to 35 million shares of Common Stock."  In June 2024, all nine

current directors were on the Board.   As a result, a majority of the current Board faces a substantial likelihood of liability due to their affirmative decision to cause the Company to purchase billions of dollars in stock at artificially inflated prices when they knew that the Company's material legal and compliance failures were hidden from the market.

94.     Additionally, Defendants Hooper, McNabb, Garcia, Gil, and Baker served on UnitedHealth's Audit Committee, which is explicitly tasked with monitoring the Company's legal and regulatory compliance. According to the Company's proxy statements, the Audit Committee "oversees management's internal controls and compliance activities."  Their failure to halt the Medicare Advantage scheme violated their obligations under the Audit Committee Charter and further supports a finding that demand is excused.

95.     Because a majority of the current Board is conflicted and cannot impartially consider a demand to sue themselves, Plaintiff is excused from making such a demand under applicable law.

### COUNT I
**Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

96.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97.     The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding the Company. Not only is the Company now defending claims that it violated Section10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself, due to the Individual Defendants' acts, was one of the largest victims of the unlawful scheme perpetrated on investors by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' material

misrepresentations, the Individual Defendants caused the Company to repurchase approximately 101.8 million of its own shares on the open market at artificially-inflated prices, damaging the Company by millions of dollars.

98.     The Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

99.     The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about the Company not misleading

100.     The Individual Defendants acted with scienter in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were senior executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

101.     In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive or director of the Company, as members of the Board, each of the Individual Defendants then

serving as a director made and/or signed the Company's Forms 10-K and Forms 10-Q filed with the SEC as alleged herein.

102.    As a result of the Individual Defendants' misconduct, the Company has suffered damages in that it paid artificially inflated prices for its stock and suffered losses when the true facts became known. The Company would not have repurchased Extreme common stock at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Individual Defendants' false or misleading statements.

103.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

104.    Plaintiff on behalf of the Company has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

105.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106.    The Individual Defendants each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of UnitedHealth's business and affairs, particularly with respect to mission-critical regulatory compliance and disclosure.

107.    The conduct by the Individual Defendants set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of UnitedHealth.

108.    In breach of their fiduciary duties owed to UnitedHealth, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its

corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

109.    As a direct and proximate result of the breaches of their fiduciary obligations by the Individual Defendants, UnitedHealth has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.   As a result of the misconduct alleged herein, defendants are liable to the Company.

110.    Plaintiff has no remedy at law.

**COUNT III**

**Against Hemsley, Burke, Witty, and Ballard for Insider Trading - *Brophy* Claim**

111.    As alleged above, Hemsley, Burke, Witty, and Ballard are fiduciaries of UnitedHealth, possessed material, non-public information of UnitedHealth, and used that information improperly to profit from sales of UnitedHealth stock. When Hemsley, Burke, Witty, and Ballard directed the stock sales set forth above, they were motivated to do so, in whole or in part, by the substance of the material, non-public information they possessed, and they acted with scienter.

112.    When Hemsley, Burke, Witty, and Ballard sold their UnitedHealth stock, they knew that the investing public was unaware of the negative material information that they possessed. They also knew that if the information were disclosed, the market price of UnitedHealth stock would be significantly lower. Hemsley, Burke, Witty, and Ballard timed their stock sales to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock they sold. They thereby benefitted by misappropriating UnitedHealth's non-public information.

113.    Plaintiff has no adequate remedy at law.

## COUNT IV

### Against Hemsley, Burke, Witty, and Ballard for Unjust Enrichment

114.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

115.    Defendants Hemsley, Burke, Witty, and Ballard collectively sold over $480 million worth of Company stock while in possession of material nonpublic information regarding UnitedHealth's failure to comply with mission critical regulatory requirements.  Through these sales, the Hemsley, Burke, Witty, and Ballard were able to avoid at least $000 million in losses, due to declines in the Company's stock price once that negative information emerged.

116.    Hemsley, Burke, Witty, and Ballard loss avoidance was derived from improper means and was to the detriment of UnitedHealth.

117.    Plaintiffs, on behalf of UnitedHealth, have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of UnitedHealth, demands judgment as follows:

A.    Declaring that plaintiff may maintain this action on behalf of UnitedHealth and that plaintiff is an adequate representative of the Company;

B.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.    Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to UnitedHealth;

D.    Directing UnitedHealth to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect UnitedHealth and its stockholders from a repeat of the damaging events described herein,

including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

       1.     a proposal to strengthen the Company's controls over financial reporting;

       2.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

       3.     a proposal to strengthen UnitedHealth's oversight of its disclosure procedures;

       4.     a provision to control insider transactions; and

       5.     a provision to permit the stockholders of UnitedHealth to nominate at least three candidates for election to the Board;

       E.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of UnitedHealth has an effective remedy;

       F.     Awarding to UnitedHealth restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

       G.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

       H.     Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

Dated: July 2, 2025

By:   Carl V. Malmstrom
Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60604
Tel: (312) 984-0000
Fax: (212) 686-0114
malmstrom@whafh.com

Benjamin I. Sachs-Michaels
**GLANCY PRONGAY & MURRAY LLP**
745 Fifth Avenue, Fifth Floor
New York, New York 10151
Telephone: (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

-and-

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
E-mail: rprongay@glancylaw.com

Alfred G. Yates, Jr.
**LAW OFFICE OF ALFRED G. YATES, JR.**
1575 McFarland Road, Suite 305
Pittsburgh, Pennsylvania 15216
Telephone: (412) 391-5164

*Counsel for Plaintiff Stephen Silverman*